IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. __:_____-CV-___-___

| | | |
|---|---|---|
| EGLĖ VAITKUVIENĖ, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SYNEOS HEALTH, INC., ALISTAIR MACDONALD and GREGORY S. RUSH,<br><br>Defendants. | : : : : : : : : : : : : : : | CLASS ACTION<br><br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff Eglė Vaitkuvienė ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Syneos Health Inc., formerly known as INC Research Holdings, Inc. ("INC" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of common stock of INC between May 10, 2017 and November 8, 2017, inclusive (the "Class Period"), alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is confirmed by §27 of the Exchange Act, 15 U.S.C. §78aa.

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). The acts and transactions giving rise to the violations of law complained of occurred and INC's headquarters are located in this District.

5. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

6. Plaintiff Eglė Vaitkuvienė purchased INC common stock during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages.

7. Defendant INC is a publicly traded clinical research organization ("CRO") with its principal executive offices at 3201 Beechleaf Court, Suite 600, Raleigh, North Carolina 27604. INC common stock traded on the NASDAQ throughout the Class Period under the ticker symbol "INCR." As of November 2, 2017, INC had more than 104.3 million shares issued and outstanding.

8. Defendant Alistair MacDonald ("MacDonald") is and was, at all relevant times, INC's Chief Executive Officer ("CEO") and a member of its Board of Directors.

9. Defendant Gregory S. Rush ("Rush") is and was, at all relevant times, the Chief Financial Officer ("CFO") of INC.

10. Defendants MacDonald and Rush are referred to herein as the "Individual Defendants." INC and the Individual Defendants are referred to herein, collectively, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

11. Defendants' scheme and course of business operated as a fraud on purchasers of INC common stock by: (i) deceiving the investing public about INC's prospects and business; (ii) artificially inflating the price of INC common stock; (iii) allowing INC to use $2.75 billion of its common stock as acquisition currency; (iv) allowing certain INC executives and insiders to sell millions of dollars of their personally held shares of INC common stock at artificially inflated prices; and (v) causing Plaintiff and other members of the Class to purchase INC common stock at inflated prices.

12. Defendant INC is a CRO that provides various clinical development services for the biopharmaceutical and medical device industries in North America, Europe, the Middle East and Africa, the Asia-Pacific, and Latin America. The Company's services include clinical trial management services comprising patient recruitment and retention, project management, clinical monitoring, drug safety/pharmacovigilance, medical affairs, quality assurance, and regulatory and medical writing; and data services consisting of clinical data management, electronic data capture, and biostatistics.

13. The Class Period starts on May 10, 2017. On that day, before the market opened, INC announced that it had agreed to acquire inVentiv Health, Inc. ("inVentiv"), a privately held, global CRO and CCO, in a stock-for-stock acquisition (the "inVentiv Acquisition"). According to the Company's press release issued that morning, "[b]ased upon the closing price of INC Research common stock on Tuesday, May 9, 2017, the transaction value[d] inVentiv at an enterprise value of approximately $4.6 billion, and the combined company at an enterprise value of approximately $7.4 billion," and "[u]pon closing of the transaction, INC Research shareholders [were] expected to own approximately 53 percent and inVentiv shareholders [were] expected to own approximately 47 percent of the combined company." Advent International and Thomas H. Lee Partners, two private equity firms who were then equal equity owners of inVentiv, would remain investors in the combined company. Defendant MacDonald commented on the announcement stating in pertinent part as follows:

> Today marks a significant milestone for INC Research. . . The combination of INC Research and inVentiv will expand our global scale and add capabilities to grow our addressable market. . . Both companies have a history of successfully integrating acquisitions, and I am confident that we will capitalize on the many opportunities this combination creates for all stakeholders.

14. That same day, also before the market opened, INC issued a press release announcing its financial results for the first quarter of 2017, the period ending March 31, 2017. The press release quoted Defendant MacDonald commenting on purportedly strong business metrics and financial prospects that supported INC's guidance increase, stating in pertinent part as follows:

> INC Research is off to a strong start in 2017, with record gross awards and continued expansion of capabilities in key areas of importance to our customers. . . INC's ability to work in a variety of flexible outsourcing models - full service, functional service, or a hybrid of both - is resonating increasingly with our customers, as demonstrated by our robust awards and strategic partnership opportunities secured during the quarter.

15. INC also conducted a conference call with investors and stock analysts that morning, providing further positive commentary concerning its business metrics and financial prospects, including discussing the purported financial benefits of the proposed inVentive Acquisition.

16. In response to these positive statements, the price of INC stock increased 20%, or more than $9 per share, from its close of $43.65 per share on May 9th to close at $52.80 per share on May 10th on unusually high trading volume of more than 4.6 million shares trading - more than three times the average over the preceding ten trading days.

17. On July 27, 2017, before the opening of trading, INC issued a press release announcing its second quarter financial results for the period ending June 30, 2017. Defendant MacDonald commented on the results stating in pertinent part as follows:

> INC delivered a second consecutive quarter of record gross and net awards, building on our momentum from the first quarter. . . We continue to see strong demand among small to mid-sized customers and are enhancing our competitive position with larger biopharma, resulting in a robust backlog for the fourth quarter of this year and the full year 2018. This momentum is continuing into the third quarter, with INC delivering two awards from a large Chinese pharma company totaling $84 million, our largest-ever awards in China. . . Accordingly, we are cautiously optimistic that we are on the path to returning the Company to double-digit organic revenue growth in 2018. We believe our continued strong awards demonstrate our

customers' confidence in our strategy and our ability to execute through the integration with inVentiv Health.

18. INC also conducted a conference call with investors and stock analysts that morning, providing further positive commentary concerning its business metrics and financial prospects, including discussing the perceived financial benefits of the proposed inVentive Acquisition.

19. On June 30, 2017, INC filed a Schedule 14A Proxy statement with the SEC (the "inVentiv Proxy") and disseminated the proxy to its current shareholders. The inVentiv Proxy sought shareholders vote on, among other things, whether to approve: (i) the inVentiv merger; (ii) the issuance of in excess of 20% of the outstanding shares of Class A common stock to inVentiv's stockholders; and (iii) in an advisory capacity, a proposal for compensation to be paid to certain executive officers of INC. The inVentiv Proxy stated that in connection with the merger, if certain conditions were satisfied, the following INC executives would receive "Golden Parachute Compensation": (i) MacDonald, $11,416,629; (ii) Rush, $9,818,872; (iii) Michael Gibertini, $7,723,125; and (iv) Christopher Gaenzle, $ 6,425,722. The inVentiv Proxy failed to disclose the material adverse information detailed below.

20. On July 31, 2017, INC held a Special Meeting of Stockholders where its shareholders approved the inVentiv Acquisition and the issuance of over 20% of the outstanding shares of INC common stock to inVentiv's stockholders and equity award holders as acquisition currency. On August 1, 2017, INC completed the inVentiv Acquisition, issuing 49,989,839 fully diluted shares of INC common stock as acquisition currency. With INC common stock trading at approximately $55 per share that day, those shares were valued at approximately $2.75 billion.

21. The statements referenced above in ¶¶ 13-15 and 17-18 were materially false and misleading when made as they failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded as follows:

(a) that inVentiv was suffering from continuing customer and regulatory delays which was reducing net service revenues;

(b) that the impact of cancellations at the end of 2016 and lower new drug approval activity during 2016 were decreasing revenues in the commercial division and that this was disproportionately impacting inVentiv;

(c) that inVentiv's business was suffering from a host of adverse factors which were negatively impacting demand for its products and services; and

(d) as a result, Defendants' statements about INC's business, operations and prospects, including the benefits to INC of the inVentiv Acquisition, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

22. On November 9, 2017, before the markets opened, INC issued a press release announcing its financial results for the third quarter, the period ending September 30, 2017. In its first quarterly report following the inVentive Acquisition, INC reported a *loss* from operations of *$88.9 million* for 3Q17, compared to *income* from operations of *$39.4 million* for 3Q16. INC also reported a 3Q17 GAAP diluted *loss of $148 million*, or *$1.70* per diluted shares, compared to 3Q16 *net income of $27 million*, or *$0.49* per diluted share – despite revenues having grown in the same period from $259.6 million in the 3Q16 to $592.2 million in the 3Q17 due to the inVentiv Acquisition. INC blamed the results on previously undisclosed "continued customer and regulatory delays" at inVentiv. INC also blamed a "decrease in revenue" in the combined commercial division in large part on "the impact of cancellations at the end of 2016," and "lower new drug approval activity during 2016."

23. Defendant MacDonald opened the earnings conference call conducted with investors and stock analysts that morning characterizing the "legacy inVentiv Commercial division's growth

challenges in 2017 and 2018" as "significant," and detailed those "challenges" in pertinent part as follows:

> These challenges include, one, ***unprecedented levels of cancellations of drug programs by our customers in late 2016 and again during the third quarter of 2017***; two, ***lower new drug approvals during 2016, which have negatively impacted 2017 revenue in particular***; and three, ***the loss of a run rate of approximately $30 million of annual revenue beginning in mid-third quarter 2017 from our largest advertising customer*** as a result of across-the-board reductions in their outsourcing spend.

24. Defendant Rush opened his remarks at the conference that morning describing "***significant changes to [INC's] backlog policy***," including now requiring that "[a]wards must have an expected start date within the six months after the end of the quarter in which the award was received versus [its] previous policy requirement of one-year," and stating that INC would "no longer record the full value of an FSP award," instead "often includ[ing] only the first year of the award." Explaining the new procedures that would be implemented in reporting backlog, Defendant Rush conceded that backlog had previously been overstated by including non-contracted for work, and had been presented in an opaque fashion, stating in pertinent part as follows:

> We will book the incremental value on a rolling quarterly basis, so we maintain approximately one-year in our backlog at any given time. We also now disclose our backlog into subcategories. First, we will disclose the portion of our backlog that's gone to contract, which we refer to as contracted backlog.
>
> We believe this portion of our backlog should be comparable to some in the industry that only report backlog on a contracted basis. Secondly, we will also disclose the portion of our backlog that has been awarded that has not gone to contract, which we refer to as awarded backlog. It is very important to note that awarded backlog goes through numerous steps on its way to contracted backlog.
>
> ***For example, a significant portion of our awarded backlog has moved from a written award to a small startup contract to allow us to contractually begin work on the study prior to completing that. Also I want to remind you that we have historically had a higher cancellation rate than the industry due to our policy of removing***

7

> *previously awarded backlog when we determine that the awards are probable of being cancelled, probable of not converting to revenue or ceased to meet the conditions for inclusion in backlog.*
>
> We believe we are one of the few in the industry, if not the only one, that takes this practice step to remove previously awarded backlog. We will continue this practice and then apply all of the above criteria to invent this backlog obtained in the merger. ***Given our conservative stance on FSP awards and the risk adjustments that we make each quarter, we expect these changes to our backlog policy will result in a more conservative book to bill relative to the industry on a go forward basis.***

25. On this news, the price of INC common stock declined precipitously, closing down more than 28% from its close of $57.50 per share on November 8th, or $16.35 per share, to closed at $41.15 on November 10th, on unusually high trading volume of almost four million shares trading.

26. On January 4, 2018, INC announced the closure of the inVentiv merger and that the Company was being renamed Syneos Health, Inc.

## ADDITIONAL SCIENTER ALLEGATIONS

27. As alleged herein, INC and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding INC, their control over, and/or receipt and/or modification of INC' allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning INC, participated in the fraudulent scheme alleged herein.

28. Defendants were further motivated to misrepresent the Company's business metrics and financial prospects in order to profit from selling INC common stock. Indeed, during the Class Period certain INC senior executives and directors sold millions of dollars of their own INC shares, including Defendant MacDonald who sold 21,731 for more than $1.235 million in gross proceeds and Defendant Rush who sold 139,862 shares for more than $8.173 million in gross proceeds.

29. INC was also able to use its artificially inflated common stock as $2.75 billion of acquisition currency to complete the inVentiv acquisition.

## LOSS CAUSATION

30. During the Class Period, as detailed herein, Defendants made false and misleading statements, and omitted material information, concerning INC's business fundamentals and financial prospects and engaged in a scheme to deceive the market.

31. By artificially inflating and manipulating INC's stock price, Defendants deceived Plaintiff and the Class and caused them losses. Defendants' prior misrepresentations and fraudulent conduct became apparent to the market on November 8, 2017, causing INC's stock price to fall precipitously as the prior artificial inflation came out of the stock price. As a result of their purchases of INC securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

32. INC' verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

33. The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of INC who knew that the FLS was false. None

of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## CLASS ACTION ALLEGATIONS

34. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) behalf of those who purchased or otherwise acquired INC common stock between May 10, 2017 and November 8, 2017, inclusive. Excluded from the Class are officers and directors of the Company as well as their families and the family of Defendant MacDonald and Rush. Class members are so numerous that joinder of them is impracticable.

35. Common questions of law and fact predominate and include whether Defendants: (a) violated the Exchange Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; (d) artificially inflated the price of INC common stock; and (e) the extent of and appropriate measure of damages.

36. Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

37. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

10
Case 5:18-cv-00029-H   Document 1   Filed 01/25/18   Page 11 of 15

38. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

39. Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

40. Throughout the Class Period, Defendants INC, MacDonald and Rush, in pursuit of their scheme and continuous course of conduct to inflate the market price of INC common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

41. During the Class Period, Defendants INC, MacDonald and Rush carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of INC common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the Class to purchase INC common stock at inflated prices; and (d) cause them losses when the truth was revealed. In furtherance of this unlawful scheme, plan and course of conduct Defendants INC, MacDonald and Rush took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.

42. Defendants INC, MacDonald and Rush had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

43. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of INC common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of INC common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Defendants INC, MacDonald and Rush, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased INC stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

44. Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Defendants INC, MacDonald and Rush, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their INC shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

45. By virtue of the foregoing, Defendants INC, MacDonald and Rush have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. 17 C.F.R. §240.10-5.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

46. Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

47. Defendants MacDonald and Rush had control over INC and made the material false and misleading statements and omissions on behalf of INC within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of his executive positions and stock ownership, as alleged above, Defendants MacDonald and Rush had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and

dissemination of the various statements which Plaintiff contends were false and misleading. Defendants MacDonald and Rush were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

48. In particular, Defendants MacDonald and Rush had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

49. By reason of such wrongful conduct, Defendants MacDonald and Rush are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants MacDonald's and Rush's wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

This 25th day of January 2018.

/s/ L. Bruce McDaniel

L. BRUCE McDANIEL (NC State Bar No. 5025)
McDANIEL & ANDERSON, L.L.P.
Lafayette Square 4942
Windy Hill Drive
Raleigh, NC 27609
Telephone: 919/872-3000
919/790-9273 (fax)

-and-

HOLZER & HOLZER, LLC
COREY D. HOLZER
Georgia Bar No. 364698
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
Telephone: 770/392-0090
770/392-0029 (fax)
cholzer@holzerlaw.com

*Attorneys for Plaintiff*