IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:18-CV-29-FL

| | | |
|---|---|---|
| EGLE VAITKUVIENE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| SYNEOS HEALTH, INC., ALISTAIR MACDONALD, GREGORY S. RUSH, MICHAEL A. BELL, ROBERT BRECKON, DAVID F. BURGSTAHLER, LINDA S. HARTY, RICHARD N. KENDER; WILLIAM E. KLITGAARD; KENNETH F. MEYERS, MATTHEW E. MONAGHAN, DAVID Y. NORTON, AND ERIC P. PACQUES, | ) ) ) ) ) ) ) ) ) ) ) | ORDER |
| Defendants. | ) | |

This putative securities fraud class action is before the court upon defendants' motion to dismiss (DE 54), pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and lead plaintiffs' motion to strike (DE 62). Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), United States Magistrate Judge Kimberly A. Swank, entered an order and memorandum and recommendation ("M&R"), granting in part and denying in part motion to strike, and recommending that defendants' motion to dismiss be denied. (DE 98). Defendants filed objections, and lead plaintiffs responded thereto. In this posture, the issues raised are ripe for ruling. For the following reasons, the court adopts the M&R in part, grants in part and denies in part lead plaintiffs' motion to strike, and grants defendants' motion to dismiss on the terms set forth herein.

## STATEMENT OF THE CASE

Plaintiff Egle Vaitkuviene commenced this action January 25, 2018, alleging defendant Syneos Health Inc. ("Syneos"), and its officers defendants Alistair MacDonald ("MacDonald") and Gregory S. Rush ("Rush"), violated the Securities Exchange Act of 1934 ("Exchange Act"), §§ 10(b) and 20(a), and applicable regulations by making fraudulent misrepresentations and omissions to investors in connection with a merger between defendant Syneos and inVentiv Health, Inc. ("inVentiv").

On May 29, 2018, the court appointed San Antonio Fire & Police Pension Fund and the El Paso Firemen & Policemen's Pension Fund as lead plaintiffs and approved lead plaintiffs' selection of counsel. Lead plaintiffs filed the operative amended complaint July 30, 2018, asserting claims for: 1) violations of Section 10(b) of the Exchange Act and Securities and Exchange Commission ("SEC") Rule 10b-5 against defendants Syneos, MacDonald, Rush, and Michael A. Bell ("Bell"), the chief executive officer of inVentiv prior to the merger, ("count one"); 2) control person liability under Section 20(a) of the Exchange Act, predicated on the alleged Section 10(b) violations, against defendants MacDonald, Rush, and Bell ("count two"); 3) violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 against defendants Syneos, MacDonald, Rush, Bell, as well as defendant Syneos's board of directors, including Robert Breckon ("Breckon"), David F. Burgstahler ("Burgstahler"), Linda S. Harty ("Harty"), Richard N. Kender ("Kender"), William E. Klitgaard ("Klitgaard"), Kenneth F. Meyers ("Meyers"), Matthew E. Monaghan ("Monaghan"), David Y. Norton ("Norton"), and Eric P. Paques ("Paques") ("count three"); and 4) control person liability under Section 20(a) of the Exchange Act, predicated on alleged Section 14(a) violations, against defendants Syneos, MacDonald, Rush, Bell, Breckon, Burgstahler, Harty, Kender, Klitgaard, Monaghan, Norton, and Eric P. Paques ("count four").

Lead plaintiffs seek to certify a class action on behalf of all purchasers of defendant Syneos's common stock between May 10, 2017, and November 8, 2017, ("class period") and all persons or entities that held defendant Syneos's common stock as of June 29, 2017. Lead plaintiffs also seek damages, costs, attorneys' fees and other relief.

On September 20, 2018, defendants filed the instant motion to dismiss for failure to state a claim.[1] Defendants argue that lead plaintiffs fail to plead an actionable misstatement or omission, fail to allege facts which raise a strong inference of scienter, and have failed to plead loss causation. In support of the motion, defendants rely upon several exhibits, including press releases, SEC filings, transcripts of investor calls, and investor presentations. Reference is made to defendants' index of exhibits submitted for the court's consideration, lodged on the docket at (DE 55-1), for a complete listing of exhibits. Lead plaintiffs responded in opposition, and defendants replied. In the meantime, lead plaintiffs filed the instant motion to strike certain exhibits filed in support of motion to dismiss, or in the alternative, to convert the motion to dismiss to a motion for summary judgment. Defendants responded in opposition on November 21, 2018, and lead plaintiffs replied December 5, 2018.

The motions were referred to magistrate judge on December 11, 2018. A few months later, related case Murakami v. Syneos Health, Inc., 3:19-CV-7377, was instituted against defendant Syneos in the United States District Court for the District of New Jersey. Upon notice that lead plaintiffs moved to intervene and transfer Murakami to this court, the magistrate judge stayed the instant action pending further litigation in Murakami. On June 2, 2020, the parties filed joint notice, indicating that Murakami was dismissed, with no appeal being filed.

---

[1] Defendants also moved to dismiss lead plaintiff El Paso Firemen and Policemen's Pension Fund for lack of subject matter jurisdiction, arguing that it lacks the capacity to sue. The magistrate judge recommended defendants' motion be denied in this part, and defendants did not object to the magistrate judge's determination. Finding no clear error, the court adopts the M&R in this part.

3

On August 7, 2020, the magistrate judge lifted stay and entered order and M&R, granting in part and denying in part lead plaintiffs' motion to strike, and recommending that that defendants' motion to dismiss be denied. Defendants filed objections to the M&R on September 4, 2020, and lead plaintiffs responded thereto on October 2, 2020.[2] Defendants filed notice of suggestion of subsequently controlling authority on February 24, 2021, citing to the case In re Triangle Cap. Corp. Sec. Litig., 988 F.3d 743, 751 (4th Cir. 2021).

## STATEMENT OF FACTS

The court incorporates herein the summary of alleged facts, as set forth in the M&R, for ease of reference.

> Defendant Syneos Health, Inc. ("Syneos"), formerly known as INC Research Holdings, Inc. ("INCR" or "Company"), is a publicly traded Delaware corporation with its principal place of business in Raleigh, North Carolina. (Am. Compl. at ¶¶ 18, 28.). INCR was primarily a contract research organization ("CRO") that assisted biopharmaceutical companies in conducting clinical trials. (Id. at ¶ 1.) In looking to expand its services, INCR sought a merger with inVentiv Health, Inc. ("inVentiv"), which was both a CRO and the top contract commercial organization ("CCO") in the world offering commercialization and post-Food & Drug Administration ("FDA") approval services. (Id. at ¶ 2.) inVentiv was a privately held company based in Boston, Massachusetts, and the biopharmaceutical industry's only provider of a full suite of commercialization and post-FDA approval services. (Id. at ¶¶ 31–32.) INCR looked to gain access to inVentiv's CCO or "commercial" segment and its strong connections to large biopharmaceutical companies. (Id. at ¶¶ 2, 30.) Lead Plaintiffs assert they and other INCR stockholders suffered damages and actual economic losses as a result of Defendants' materially false and misleading statements leading up to the merger of INCR with inVentiv. Lead Plaintiffs bring this action on behalf of themselves and (a) all persons or entities that purchased or otherwise acquired shares of INCR common stock between May 10, 2017, and November 8, 2017 ("Class Period"), and were damaged thereby ("Section 10(b) Class"); and (b) all persons or entities that held shares of INCR common stock as of June 29, 2017 ("Section 14(a) Class"). (Id. at ¶ 13.)

> Defendant Alistair Macdonald ("Macdonald"), served as INCR's Chief Executive Officer ("CEO") and as a board member of INCR. (Am. Compl. at ¶ 19.) Defendant Gregory S. Rush ("Rush") served as INCR's Executive Vice

[2] The case was reassigned to the undersigned on January 20, 2021.

4

President and Chief Financial Officer ("CFO") until his departure from INCR on February 21, 2018. (Id. at ¶ 20.) Defendant Michael A. Bell ("Bell") served as inVentiv's CEO and Chairman of the Board before the merger and has served as the Executive Chairman of the Board of INCR since August 1, 2017. (Id. at ¶ 21.) The foregoing individual defendants are named as defendants in the Section 10(b), Section 14(a), and both Section 20(a) claims asserted by Lead Plaintiffs.

In November 2016, Defendants Macdonald and Bell had an initial meeting to discuss a merger between INCR and inVentiv. (Am. Compl. at ¶ 35.) Macdonald, Rush, Bell and other INCR and inVentiv executives continued these discussions among themselves and with the INCR board over a period of five months. (Id.) After five months of discussion, the companies reached an agreement, subject to approval by INCR stockholders, to merge the two companies in 2017. (Id.) It was agreed that Macdonald would serve as CEO of the combined company, Rush would serve as CFO, and Bell would serve as Executive Chairman and manage the commercial segment of the combined company. (Id.)

INCR and inVentiv issued a joint press release announcing the merger on May 10, 2017. (Am. Compl. at ¶ 36.) Defendants Macdonald, Rush, and Bell began to promote the merger to obtain the necessary vote from the outstanding shares of INCR common stock. (Id.) The individual Section 10(b) Defendants stated that the combined company was expected to achieve immediate mid- to high-single-digit accretion to adjusted earnings per share in 2018 and 9% or double-digit growth in 2018, driven by growth in the commercial business. (Id. at ¶ 37.) The Section 10(b) Defendants suggested that the CCO acquired from inVentiv would grow more than the industry average of 8% and would be a long-term growth story. (Id.) The merger was also promoted by highlighting the leadership strengths and capabilities of Defendants Macdonald, Rush, and Bell as the key leaders of the combined company. (Id. at ¶ 38.) Defendant Rush emphasized that INCR and inVentiv both had "a history of value creation through successful integration of past acquisitions," while continuing to grow and expand their consumer base without negatively impacting customers. (Id.) Rush noted that, since 2007, INCR had completed seven acquisitions and inVentiv had completed twenty-five acquisitions. (Id.) Defendant Rush stated that many of the team involved in leading the successful integrations are within INCR and "[c]learly, we know how to integrate and drive value creation." (Id.) Due to inVentiv being a privately held company, statements from the Section 10(b) Defendants were investors' primary exposure to inVentiv's recent operating condition, financial results, and prospects. (Id. at ¶ 39.)

inVentiv had previously been successful at winning large contracts with big pharmaceutical companies who hired CCOs to commercialize drugs newly approved by the Food and Drug Administration ("FDA") and with its ability to win contracts from pharmaceutical companies with sales teams of 100 or more sales representatives ("100-plus sales team contracts"). (Am. Compl. at ¶ 7, 41, 42.) Such contracts contributed to the 15% annual revenue growth in its commercial business from 2013 to 2016. (Id.) However, dependence upon contracts from such

large pharmaceutical companies and its lack of pursuit of smaller contracts with smaller companies left inVentiv susceptible to "revenue swings." (Id. at ¶ 43.)

The number of FDA-approved drugs fell from 45 in 2015 to 22 in 2016; out of the newly approved drugs that were put out to bid for commercial services, inVentiv won only two. (Am. Compl. at ¶ 44.) In 2017, new drug approvals increased to historical levels, but only two 100-plus sales team contracts were available for bid, neither of which inVentiv won. (Id. at ¶ 45.) Defendant Rush explained there was a one-year lag between inVentiv's sales and revenue growth. (Id. at ¶ 44.) Although inVentiv experienced double-digit growth in 2016, the results did not continue to 2017 and 2018 due to the decline in 100-plus sales team contracts secured by inVentiv and an increase in cancellations of existing commercial contracts. (Id. at ¶¶ 45, 46.) Defendant Rush also stated the Company was underbid by competitors who offered to perform the work for less money. (Id. at ¶ 45.) At the time of the merger announcement, the Section 10(b) Defendants knew but did not disclose that inVentiv's CCO segment was struggling to win any new business and had yet to win any 100-plus sales team contracts in 2017. (Id. at ¶ 47.) Instead, the Section 10(b) Defendants highlighted that FDA new drug approval numbers were on track to double in 2017, stating "[t]his trend, coupled with inVentiv's pipeline, sets the foundation for a strong growth in 2018 and beyond." (Id. at ¶¶ 48, 99.)

On July 27, 2017, INCR announced its second quarter 2017 earnings, and the Section 10(b) Defendants confirmed their confidence in the combined company's 2018 growth prospects, stating "[W]e're more optimistic today than we were on May 10." (Am. Compl. at ¶ 50.) Defendant Rush stated that "new drug approvals are pretty strong so far this year, which is a precursor to the commercial business." (Id.) Defendant Rush reiterated "a lot of people are predicting 40 to 50 approvals this year which if we go back to that level that should, in theory, give us an opportunity to return to strong growth in commercial in 2018." (Id. at ¶ 51.)

On July 31, 2017, INCR held a special shareholder meeting at which the proposed merger was approved by nearly 99% of voting shares. (Am. Compl. at ¶¶ 52, 244.) Before the meeting, INCR made various filings with the SEC pursuant to Section 14(a), which included a May 10, 2017, press release; a May 10, 2017, Investor Presentation; a transcript of the May 10, 2017, Investor Conference Call; a Preliminary Proxy statement; a Definitive Proxy statement; and "definitive additional material" to the Definitive Proxy statement ("Proxy Materials"). (Id. at ¶¶ 229–34.) The Proxy Materials were distributed to INCR shareholders before the July 31, 2017, meeting and solicited the vote of shareholders in favor of the merger. (Id. at ¶ 237.) These Proxy Materials described the terms of the transaction, the background giving rise to the agreement, and information on merger-related compensation. (Id. at ¶¶ 235–36.) The Proxy Materials were disseminated and approved by Defendants INCR, Macdonald, Rush, Bell, and the Board of INCR (which included Robert Breckon, David F. Burgstahler, Linda S. Harty, Richard N. Kender, Williams E. Klitgaard, Kenneth F. Meyers, Matthew E. Monaghan, David

Y. Norton, and Eric P. Pâques). (Id. at ¶¶ 214–24.) Among other things, the Proxy Materials stated the Board of INCR had performed due diligence, which included the review of detailed information about inVentiv, and developed an "understanding of the respective businesses, operations, financial condition, earnings, strategy and prospects of INCR and inVentiv." (Id. at ¶¶ 226–27.)

The merger of inVentiv and INCR was completed on August 1, 2017, with INCR designated as the surviving corporation. (Am. Compl. at ¶ 52.) As a result of the merger, Defendants Macdonald and Rush earned over $21 million combined in merger-related compensation. (Id. at ¶¶ 53, 73.) Defendants Macdonald and Rush also sold shares of their personal INCR stock during the Class Period. (Id.) From June 30, 2017 to September 18, 2017, Defendant Macdonald sold 21,731 shares of INCR common stock—approximately 18% of his total holdings—for a total of $1.2 million. (Id. at ¶ 76.) From August 30, 2017 to September 18, 2017, Defendant Rush sold 139,862—approximately 18% of his total holdings—for a total of $8.1 million. (Id. at ¶ 77.) The "vast majority" of these sales took place before September 6, 2017 (id. at ¶ 78), an important date for the reason described below.

On September 6, 2017, Defendant Rush stated at the Wells Fargo Securities Healthcare Conference that INCR's commercial business was a "wild card" and that uncertainties of revenue growth might occur in 2018. (Am. Compl. at ¶ 54, 167.) These statements caused INCR's stock price to decline over 5%. (Id.) The following day at the Robert W. Baird Global Healthcare Conference, when questioned by analysts, Defendant Rush stated that a "wild card" is the most valuable card in a poker game and, in response to question whether INCR could foresee a decline in CCO revenue for the next year, assured investors there were no new developments that would change the company's growth rate for 2018. (Id. at ¶¶ 55–56.) Rush stated that "there's nothing that—there's not new news here on that that we're trying to lay out to the market." (Id. at ¶ 56.) Rush also said that Defendant Macdonald had "banned" him from using the "wild card" term again. (Id. at ¶ 55.) Rush did not mention that, up to that point, the commercial sector of inVentiv, now part of the newly formed company, had not secured any 100-plus sales team contracts for that year. (Id. at ¶ 56.)

On November 9, 2017, Section 10(b) Defendants announced that the Company would experience "roughly flat" commercial revenue growth in 2018 and that this would reduce total company-wide (i.e. across both the CRO and CCO sectors) revenue growth from double-digit growth to mid- to high-single-digit growth. (Am. Compl. at ¶ 57.) Defendants also disclosed that the "best leading indicator" for revenue growth in the commercial sector was the ability to win 100-plus sales team contracts, rather than the number of new drug approvals by the FDA, and that they had not secured any such contracts in 2017. (Id. at ¶ 58.) These announcements caused INCR's stock price to drop over 28% in a single day. (Id. at ¶¶ 58–59.) Over the next four days, the share price fell over 40%, causing millions of dollars' worth of investor losses. (Id. at ¶¶ 59, 145.)

On December 7, 2017, the Company filed a Form 8-K with the SEC disclosing that Defendant Bell ceased to be President of the commercial sector of the new company and as an executive officer of the Company but would continue to serve as Chairman of the Board. (Am. Compl. at ¶ 147.) After the market closed on January 3, 2018, the Company announced Defendant Rush's departure effective April 30, 2018; INCR's share price fell 5.7% the next day. (Id. at ¶ 148, 170.) On February 22, 2018, INCR filed another Form 8-K disclosing that Defendant Rush would step down as CFO that day and that Christopher L. Gaenzle, INCR's Chief Administrative Officer, General Counsel, and Secretary, had resigned approximately one week earlier. (Id. at ¶¶ 153, 171.) This news caused stock prices to fall approximately 16%. (Id. at ¶¶ 60, 153–156, 171.) Around this time, Defendant Macdonald stated that the company was shifting its focus from 100-plus sales team contracts to contracts with smaller sales teams in order to diversify and "build a much more stable trajectory" for its commercial sector. (Id. at ¶ 60, 151–152.).

(M&R at 4-12).[3]

**COURT'S DISCUSSION**

A.    Motion to Strike

    1.    Standard of Review

A district court may designate a magistrate judge to hear and decide any "pretrial matter not dispositive of a party's claim or defense." Fed. R. Civ. P. 72(a); see also 28 U.S.C. § 636(b)(1)(A). Upon timely objection by a party, the court must modify or set aside any part of a magistrate judge's order that is "clearly erroneous" or "contrary to law." Fed. R. Civ. P. 72(a); see also Local Civil Rule 72.4(a). "A factual finding is clearly erroneous when [the court is] 'left with the definite and firm conviction that a mistake has been committed.'" TFWS, Inc. v. Franchot, 572 F.3d 186, 196 (4th Cir. 2009) (quoting Anderson v. Bessemer City, 470 U.S. 564, 573 (1985)). "Contrary to law" indicates plenary review of legal conclusions. Stonecrest Partners, LLC v. Bank of Hampton Roads, 770 F. Supp. 2d 778, 782 (E.D.N.C. 2011) (citing PowerShare,

---

[3]    Unless otherwise specified, the court uses the page numbers assigned by its case management and electronic case filing system ("CM/ECF").

Inc. v. Syntel, Inc., 597 F.3d 10, 15 (1st Cir. 2010)). Therefore, "for questions of law, there is no practical difference between review under Rule 72(a)'s 'contrary to law' standard and review under Rule 72(b)'s de novo standard." PowerShare, 597 F.3d at 15.

2.    Analysis

Defendants object to the magistrate judge's exclusion of Forms 4 filed with the SEC by defendants Macdonald and Rush ("exhibits 18 through 32"), attached to defendants' motion to dismiss.[4]

Ordinarily, "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(c). However, a court may consider a document attached to the motion to dismiss if "the document is 'integral to and explicitly relied on in the complaint,' and when 'the plaintiffs do not challenge the document's authenticity.'" Zak v. Chelsea Therapeutics Int'l, Ltd., 780 F.3d 597, 606-07 (4th Cir. 2015) (quoting Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004)). A "document is integral to the complaint where the complaint relies heavily upon its terms and effect." Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016) (citation omitted).

Here, the documents at issue are SEC Forms 4, which reflect defendants Macdonald's and Rush's stock transactions. The amended complaint refers to these transactions in explicit detail, providing the exact number of shares sold, the price of those shares, and the dates on which the

---

[4]    Defendants also object to the magistrate judge's exclusion of 1) defendant Syneos's Form 8-K, filed with the SEC on July 27, 2017, ("exhibit eight") (DE 55-11); 2) defendant Syneos's presentation at the Wells Fargo Healthcare Conference on September 6, 2017, ("exhibit 12") (DE 55-15); and 3) defendant Syneos's presentation at the Baird Global Healthcare Conference on September 7, 2017, ("exhibit 14") (DE 55-17). According to defendants, the Private Securities Litigation Reform Act requires the court to consider these documents when deciding whether to dismiss Section 10(b) claims. (See Mem. (DE 101) at 24-25). As stated in more detail herein, the court grants defendants' motion to dismiss the Section 10(b) claims, without consideration of exhibits eight, 12, and 14. Therefore, defendants' objection to this part of the M&R is moot.

transactions occurred.  (Am. Compl. ¶¶ 53, 74-78).  Defendants contend that the Forms 4 were lead plaintiffs' exclusive source for such allegations, and lead plaintiffs do not suggest otherwise. Moreover, lead plaintiffs' scienter theory relies heavily on these transactions.  (See, e.g., id. ¶ 74) ("Defendants Macdonald and Rush also profited through their fraud by selling significant portions of their holdings at artificially-inflated prices.").  Finally, lead plaintiffs do not dispute that the Form 4s attached to the motion to dismiss are the same Forms 4 that defendant Macdonald and Rush filed with the SEC.  Therefore, the court may consider the Forms 4.

Lead plaintiffs argue, nonetheless, that the court must exclude the Forms 4, relying upon Zak.  In Zak, the United States Court of Appeals for the Fourth Circuit held that the district court improperly considered Forms 4 that were attached to motion to dismiss. 780 F.3d at 607.  Zak is instructively distinguishable, however, because the complaint in that case did not include any allegations about stock sales.  See id. ("Although plaintiffs asserting securities fraud claims frequently bolster allegations regarding scienter by asserting unusual sales of stock by individuals accused of committing securities fraud, the plaintiffs in the present case did not include this type of allegation in their complaint . . . Therefore, because the SEC documents were not explicitly referenced in, or an integral part of, the plaintiffs' complaint, the district court should not have considered those documents in reviewing the sufficiency of the plaintiffs' allegations.").[5] Accordingly, in Zak, the Forms 4 were not an integral part of the complaint.  See id.

Here, in contrast, lead plaintiffs have placed defendants Rush's and Macdonald's stock sales in issue, and they rely heavily on those sales to support their scienter theory.  Under such

---

[5]    Lead plaintiffs also cite Epstein v. World Acceptance Corp., No. 6:14-CV-01606-MGL, 2015 WL 2365701, at *1 (D.S.C. May 18, 2015) for the proposition that Forms 4 should not be considered on a motion to dismiss. However, as in Zak, the complaint in Epstein did not include insider trading allegations, which makes it distinguishable from the instant matter.

circumstances, courts routinely consider Forms 4 attached to motions to dismiss. See Yates, 744 F.3d at 891 (explaining that Forms 4 attached to motion to dismiss reflecting trades made pursuant to a non-discretionary Rule 10b5-1 plans weakened the scienter inference)[6]; In re PEC Sols., Inc. Sec. Litig., 418 F.3d 379, 390, n. 10 (4th Cir. 2005) (taking judicial notice of the defendants' SEC filings related to sale of stock).

Accordingly, the court denies that part of lead plaintiffs' motion seeking to strike exhibits 18 through 32, and affirms the magistrate judge's ruling on motion to strike in remaining part.

B.     Motion to Dismiss

1.     Standard of Review

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

---

[6]     As here, the Rule 10b5-1 plans were part of the record because they were reflected in Forms 4 attached to the motion to dismiss.  See In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig., 876 F. Supp. 2d 616, 642 (D. Md. 2012), aff'd sub nom. Yates v. Mun. Mortg. & Equity, LLC, 744 F.3d 874 (4th Cir. 2014) ("Joseph established his Rule 10b5–1 plan in March 2005, see Apr. 28, 2005 Form 4, Holland Ex. 11, and Falcone established his plan in September 2003, see Oct. 4, 2004 Form 4, Holland Ex. 7.").

Ordinarily, a plaintiff need only make "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, Rule 9(b) creates an exception to this liberal pleading standard and requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "This heightened pleading requirement serves to protect defendants' reputations from baseless accusations, eliminate meritless suits brought only to extract a settlement, discourage fishing expeditions, and provide defendants with enough information about a plaintiff's allegations to mount a defense." Maguire Fin., LP v. PowerSecure Int'l, Inc., 876 F.3d 541, 546 (4th Cir. 2017) (citing Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP, 551 F.3d 305, 311 (4th Cir. 2009)).

"[T]he inconsistent application and interpretation of Rule 9(b) and other abuses in securities cases prompted Congress to enact the PSLRA [Private Securities Litigation Reform Act]." Maguire Fin., 876 F.3d at 546 (quoting Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 171 (4th Cir. 2007)). Where plaintiff alleges defendant made an untrue material statement or omitted a material statement of fact that would be necessary to make a statement not misleading, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

The district court reviews de novo those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis,

718 F.2d 198, 200 (4th Cir. 1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

2.    Analysis

a.    Section 10(b) Claims – Count One

Section 10(b) of the Exchange Act, makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Section 10(b) is implemented by Rule 10b-5, which makes it unlawful "[t]o employ any device, scheme or artifice to defraud[;] [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or[;] [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5. Section 10(b) provides an implied private right of action, and the plaintiff in such an action "must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Inv. Partners v. Sci.-Atlanta, Inc., 552 U.S. 148, 157 (2008).

Here, the magistrate judge determined that lead plaintiffs sufficiently alleged the foregoing elements. Defendants object to the magistrate judge's determination, arguing that lead plaintiffs have not pleaded a strong inference of scienter, among other elements.[7]

---

[7]    Where the court agrees that lead plaintiffs fail to plead a strong inference of scienter, the court dismisses lead plaintiffs' 10(b) claims on this basis, and does not reach defendants' additional objections to M&R.

Scienter refers to "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs Inc. v. Makor Issues & Rts, Ltd., 551 U.S. 308, 319 (2007). This state of mind "encompasses 'severe recklessness', defined as 'an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" In re Triangle Cap., 988 F.3d at 751 (quoting Ottmann v. Hanger Orthopedic Grp., Inc., 353 F.3d 338, 343 (4th Cir. 2003)).

Under the PLSRA, a plaintiff must "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). "Evaluating the strength of an inference is necessarily a comparative inquiry." Yates, 744 F.3d at 885 (citing Tellabs, 551 U.S. at 326–27). "A scienter inference is 'strong' if, when 'weighed against the opposing inferences that may be drawn from the facts in their entirety,' it 'is at least as compelling as any opposing innocent inference.'" In re Triangle, 988 F.3d at 751 (quoting Yates, 744 F.3d at 885). In determining the strength of a scienter inference, the court "review[s] the facts holistically and afford[s] them the inferential weight warranted by context and common sense." Id. (internal quotation and citation omitted).

Here, lead plaintiffs argue that, prior to defendant Syneos's merger with inVentiv, defendants knew inVentiv's commercial segment was highly dependent on obtaining contracts with 100-plus sales team pharmaceutical companies, that only two such contracts were available for bid as of May, June, and July 2017, and inVentiv failed to secure either of those contracts. Lead plaintiffs further assert that defendants withheld this information in order to obtain shareholder approval of the merger, and instead told shareholders that the key metric for growth was the number of new drug approvals by the Federal Drug Administration ("FDA"). Once the

14

shareholders approved the merger, lead plaintiffs assert defendant benefited from their alleged omissions by selling their stock at an inflated price and only then revealed the purported true key metric—the 100-plus sales team contracts.

Lead plaintiffs' allegations fail to support this scienter theory. First, lead plaintiffs rely heavily on the notion that defendants knew, prior to the merger, that the key metric for inVentiv's commercial success was its ability to obtain contracts with 100-plus sales team pharmaceutical companies. To establish this knowledge, lead plaintiffs point to allegations that defendants had experience with acquisitions, and they performed due diligence by reviewing inVentiv's "relationships with key customers", "financial, operating and other information", "non-public financial forecasts", "material contracts", and "customer overlap" prior to the merger. (Am. Compl. ¶¶ 62-66, 226). While relevant to the court's holistic analysis, defendants' access to information, alone, does not establish scienter. Yates, 744 F.3d at 890 ("A pleading of scienter . . . may not rest on a bare inference that a defendant must have had knowledge of the facts or must have known of the fraud given his or her position in the company." (citation omitted)); see also Lerner v. Nw. Biotherapeutics, 273 F. Supp. 3d 573, 593 (D. Md. 2017) ("Courts have routinely held that corporate executives' access to information and internal affairs is not enough to demonstrate scienter under the PSLRA."); In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d 510, 538 (S.D.N.Y.) (explaining that "bare assertions that the defendants, due to their high-level positions in the Company, had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports, without any further facts or details, do not adequately demonstrate defendants' knowledge of facts or access to information contradicting their public statements").

15

Instead, to demonstrate scienter, lead plaintiffs must provide "additional detailed allegations establishing the defendants' <u>actual exposure</u>" to information identifying 100-plus sales team contracts as the key metric for success. <u>Yates</u>, 744 F.3d at 890 (emphasis added). Here, lead plaintiffs have not pleaded such allegations with sufficient particularity. Specifically, lead plaintiffs do not allege when defendants learned that 100-plus sales teams were the key metric, who informed them, how confident the source was in this metric, or whether the source informed defendants how many 100-plus sales team contracts were required for commercial success. <u>See</u> <u>In re Triangle Cap.</u>, 988 F.3d at 752 (finding allegations of scienter to be insufficient where lead plaintiff "never specifies when this advice was given, how firm in their conviction these investment advisors were in recommending that Triangle should avoid mezzanine deals moving forward, or what a mix of mezzanine and unitranche investments should look like"). These "omissions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" <u>Id.</u> (citing <u>Tellabs</u>, 551 U.S. at 326))

In fact, the only instance where lead plaintiffs allege any specific connection between defendants and the phrase "100-plus sales team" is during defendants' post-merger November 9, 2017, conference call with shareholders. (Am. Compl. ¶¶ 134-137). During that call, in response to a question posed by a shareholder about the decline in the commercial segment, defendant Rush stated:

> John, <u>one of the things that we're going to try to do, and I'm not going to make a</u> <u>commitment that we'll be able to do it is,</u> obviously, <u>one of the things that we're</u> <u>getting a handle on is what are the best leading indicators of revenue growth.</u> . . One of the things that I would tell you that we're – we saw this year, even though new drug approvals are upon and probably going to be in the low 40s, the mix of those drugs that are approved are smaller compounds and not producing some of the big sales teams that we saw even in '16. <u>So I may have that wrong, so use, this,</u> <u>what I'm about to say as directional.</u> But I think last year, we had 4 – there was 4

or 5 100-plus sales teams that went out to bid to the industry. So there's only 4 or 5 proposals last year whereas in the years before, it was much greater than that Two were actually awarded to us last year, and we lost 3. So we had a 40% hit rate last year. I believe this year, there's only been 2 that have even gone out to bid to the sector and both of those were awarded to others based on price. We weren't willing to match the price and our competitors were willing to do that . . . And so that's one of the reasons why we also tempered our expectation for '18. We had expected commercial to have double-digit growth next year in our original proxy filing. But they – that's not going to happen right now because we haven't won those big 100-plus selling teams this year that we would have expected to.

(Am. Compl. ¶ 137 (emphasis added)); see November 9, 2017, Transcript (DE 55-19) 12-13).

Reliance on defendant Rush's statement to show that defendants knew the purported key metric all along "amounts to little more than pleading fraud by hindsight." In re Triangle Cap., 988 F.3d at 753. Rather than evincing an intent to deceive or severe recklessness, the statement reveals that defendants' understanding of inVentiv's commercial segment continued to evolve following the merger. (Am. Compl. ¶ 137) ("[O]ne of the things that we're getting a handle on . . . So I may have that wrong, so use, this, what I'm about to say as directional."). Lead plaintiffs "cannot connect the backwards-looking statements of [defendant Rush] to actual contemporaneous knowledge" that 100-plus sales team contracts were the true metric. In re Triangle Cap., 988 F.3d at 752. Lead plaintiffs' "argument is purely speculative." Id.

Next, lead plaintiffs argue that defendants' pre-merger statements reflecting confidence in growth prospects support a strong inference of scienter. In particular, lead plaintiffs point to defendants' pre-merger statements that: 1) they "expect[ed] the combined company to grow revenue at 9% per year", (Am. Compl. ¶ 99); 2) "there's over 70 new drug applications this year. Not all of those will get approved, but we think they're on pace to double. That is a leading indicator as you're thinking about modeling the commercial business going forward as to what that market looks like", (id.); 3) "I wouldn't give that kind of commentary if we didn't feel at this stage, based on what we see today, that we were confident in it", (id.); 4) "We're more optimistic

today than we were on May 10 on . . . the combined compan[y's] numbers for 2018", (id. ¶ 50);

5) "[N]ew drug approvals are pretty strong so far this year, which a is a precursor to the commercial

[business]. We got to go close that business in the second half of this year in the commercial

business for sure, but at least the leading indicator is good for that business. So we're more

optimistic today than we were in May given our first half results", (id.); and 6) "a lot of people are

predicting 40 to 50 approvals this year which if we go back to that level, that should in theory,

give us an opportunity to return to strong growth in commercial in 2018", (id. ¶ 51).

These bullish statements, reflecting defendants' optimism, do not give rise to a strong

inference of scienter. "The PSLRA reflects Congress's determination that liability for securities

fraud should not be predicated solely on an overly optimistic view of a future which may, in fact,

encounter harsh economic realities down the road." Maguire Fin., 876 F.3d at 548. In this vein,

"courts have long accepted that immaterial boasting and exaggerations, often called puffery, do

not normally constitute actionable fraud." Xia Bi v. McAuliffe, 927 F.3d 177, 183 (4th Cir. 2019)

(citations omitted). Otherwise, if courts "inferred scienter from every bullish statement by a

pharmaceutical company that was trying to raise funds, [they] would choke off the lifeblood of

innovation in medicine by fueling frivolous litigation—exactly what Congress sought to avoid by

enacting the PSLRA." Cozzarelli v. Inspire Pharms. Inc., 549 F.3d 618, 627 (4th Cir. 2008).

Lead plaintiffs also suggest that the temporal proximity between defendants' optimistic

statements in May and July 2017; their September 6, 2017, statement that the commercial sector

was a "wild card"; and their more conservative projections in November 2017, demonstrates

wrongful intent. This argument ignores the fact that inVentiv's results were "subject to some

quarterly variability", (see Proxy (DE 55-13) at 172), and that its revenues were weighted towards

the end of the year. (See id. ("inVentiv has historically experienced an increase in net revenues

18

in the fourth quarter."); (Transcript July 27, 2017 (DE 55-10) at 8 ("[N]ew drug approvals are pretty strong so far this year, which is a precursor to the commercial. We got to go close that business in the second half of this year in the commercial business for sure."); (Transcript September 7, 2017 (DE 55-16) at 6 ("[End-year sales drive this business"). Given the seasonality of inVentiv's business, it is reasonable that defendants' optimistic projections evolved in response to developments in the commercial sector, including disappointing revenues in the latter half of 2017. See Hillson Partners Ltd. P'ship v. Adage, Inc., 42 F.3d 204, 209 (4th Cir. 1994) ("Where fraudulent projections are alleged, the plaintiff must [] identify in the complaint with specificity some reason why the discrepancy between a company's optimistic projections and its subsequently disappointing results is attributable to fraud."). For this same reason, the fact that only two 100-plus sales team contracts were available for bid during the first half of 2017 does not undermine defendants' contemporaneous optimistic projections, since "end-year sales drive this business", (Transcript September 7, 2017 (DE 55-16) at 6).

Next, lead plaintiffs argue that defendants Rush's and Macdonald's merger-based compensation gives rise to a strong inference of scienter. In particular, lead plaintiffs point to the merger proxy, which indicated that defendant Macdonald could receive $11,416,629.00 and defendant Rush could receive $9,818,872.00 in cash and equity as compensation related to the merger, which was two times more than defendant Macdonald's 2016 compensation and more than three times defendant Rush's 2016 compensation. (Am. Compl. ¶ 72). However, "the motivations to raise capital or increase one's own compensation are common to every company and thus add little to an inference of fraud." Cozzarelli, 549 F.3d at 627; see Ottmann, 353 F.3d at 352 ("[C]ourts have repeatedly rejected these types of generalized motives—which are shared

19

by all companies—as insufficient to plead scienter under the PSLRA.") (emphasis in original) (citations omitted)).

Lead plaintiffs also rely upon defendants Rush's and Macdonald's stock sales during the class period to establish scienter. Insider trading can imply scienter only if the timing and amount of a defendant's trading were "unusual or suspicious." In re PEC Sols., Inc. Sec. Litig., 418 F.3d 379, 390 (4th Cir. 2005); see Teachers' Ret. Sys., 477 F.3d at 184. Here, lead plaintiffs allege that from June 30, 2017, to September 18, 2017, defendant Macdonald sold 21,731 shares of defendant Syneos's common stock, representing approximately 18% of his total holdings, for over $1.2 million, and that from August 30, 2017, to September 18, 2017, defendant Rush sold 139,862 shares of defendant Syneos's common stock, representing approximately 64% of his total holdings, yielding total gross proceeds of $8.1 million. (Am. Compl. ¶¶ 76-77). These transactions occurred during the class period, and the sale price of the stock ranged from $54.48 to $59.21 per share, which is higher than the stock's 2017 low point of $40.65. (Id. ¶¶ 13, 74, 76-77). Such allegations are consistent with an inference that the insiders who traded during the class period had a motive to commit fraud.

However, the inference that the trades were innocent is stronger. First, while the sales occurred during the class period, none of the sales coincide with defendants' May 10, 2017, July 27, 2021, September 6, 2017, or September 7, 2017, disclosures. (See id. ¶¶ 76-77) (alleging sale dates of June 30, July 3, August 17, August 30, and September 18, 2017). Moreover, as shown in defendants Rush's and Macdonald's Forms 4, the sales were made pursuant to non-discretionary Rule 10b5-1 plans that were formed in 2016, well before the class period, (see, e.g., Form 4 (DE 21)). "[A]lthough the Rule 10b5–1 plan[s] do[ ] not completely immunize [defendants Macdonald and Rush] from suspicion, it does mitigate any inference of improper motive surrounding [their]

sales." <u>Yates</u>, 744 F.3d at 891.[8] Finally, the amended complaint does not provide defendants Rush's and Macdonald's trading patterns outside the class period to permit comparison with their trades within the class period, which also weakens any scienter inference. <u>Teachers' Ret. Sys</u>, 477 F.3d at 185 (faulting plaintiff for stating defendants' trading history for only during the class period).

Next, lead plaintiffs argue that the executive departures following the merger demonstrate scienter. They point to allegations that defendant Syneos announced on December 7, 2017, that defendant Bell was no longer president of the commercial segment, and approximately one month later, it announced that defendant Rush would remain the chief financial officer only until April 30, 2018. (Am. Compl. ¶¶ 147-48). Then, on February 21, 2018, defendant Syneos announced that defendant Rush was no longer chief financial officer, and that Gaenzle, its chief administrative officer, general counsel, and secretary, had resigned on February 14, 2018. (<u>Id.</u> ¶ 153). No reasons were given for Gaenzle's resignation or defendant Rush's accelerated departure. (<u>Id.</u>).

While these allegations are relevant to the court's holistic analysis, without more, they do not give rise to a strong inference of scienter. First, lead plaintiffs do not allege that Gazenzle and defendants Rush and Bell departed from defendant Syneos because they were suspected of wrongdoing. Moreover, there are a number of reasons executives may depart from a company, including disappointing revenues under their leadership, such as those that preceded defendants

---

[8]      Lead plaintiffs argue that the court may not consider the Rule 10b5-1 plans on a motion to dismiss because such plans are subject to manipulation and present questions of fact, citing <u>Freudenberg v. E*Trade Fin Corp.</u>, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2011). However, in <u>Yates</u>, Fourth Circuit considered the fact that trades were conducted under Rule 10b5-1 plans when evaluating scienter allegations on a motion to dismiss. 744 F.3d at 891. As here, the Rule 10b5-1 plans were part of the record because they were reflected in Forms 4 attached to the motion to dismiss. <u>See In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.</u>, 876 F. Supp. 2d 616, 642 (D. Md. 2012), <u>aff'd sub nom. Yates v. Mun. Mortg. & Equity, LLC</u>, 744 F.3d 874 (4th Cir. 2014) ("Joseph established his Rule 10b5–1 plan in March 2005, <u>see</u> Apr. 28, 2005 Form 4, Holland Ex. 11, and Falcone established his plan in September 2003, <u>see</u> Oct. 4, 2004 Form 4, Holland Ex. 7."). The Fourth Circuit held that "although the Rule 10b5–1 plan does not completely immunize Joseph from suspicion, it does mitigate any inference of improper motive surrounding his sales." <u>Yates</u>, 744 F.3d at 891.

Rush's and Bell's departures. Cf. Yates, 744 F.3d at 889 ("[R]esignation of the defendant's independent public accountant did not support a strong inference of scienter because the firm had just been partially responsible for the corporation's failure to adequately control its accounting procedures."); see also Rosenzweig v. Azurix Corp., 332 F.3d 854, 867 (5th Cir. 2003) (explaining that "the successive resignations of key officials . . . is more likely probative only of the fact that the company was failing"). These departures do not support a strong inference of scienter.

Lead plaintiffs cite Epstein v. World Acceptance Corp., 203 F. Supp. 3d 655 (D.S.C. 2016) and Willis v. Big Lots, Inc., No. 2:12-CV-604, 2016 WL 8199124 (S.D. Ohio Jan. 21, 2016). However, those cases do not compel a different result. In Epstein, the court simply held that while executive departures, alone, could not establish scienter, they factor into the court's "holistic analysis." 203 F. Supp. 3d at 671. Likewise, the court in Willis considered corporate resignations in "viewing the evidence as a whole" and found the timing of those resignations to be noteworthy, where they occurred on the last day of the class period and on the wake of an investigation by the United States Department of Justice. 2016 WL 8199124, at *34. Here, the departures occurred months after the class period ended, and none of the departing executives were under investigation.

In sum, weighing the competing inferences, lead plaintiffs' allegations of fraud are not cogent and compelling compared to the alternative explanation — that defendants, genuinely optimistic about the growth prospects of a merger, in an industry driven by end-year sales, conveyed such optimism to shareholders in the middle of 2017; then, when year-end revenues did not rise to expected levels, defendants revised their earlier projections to take into account developments in the commercial sector following the complex integration of two companies.

22

Accordingly, lead plaintiffs have not met their heightened burden under the PSLRA to plead scienter, and defendants' motion to dismiss is granted in this part. Lead plaintiffs' Section 10(b) claims are dismissed without prejudice.

          b.      Section 20(a) Claims – Count Two

Lead plaintiffs asserts claims for control person liability under Section 20(a) of the Exchange Act against defendants Bell, Rush, and Macdonald.

Section 20(a) of the Exchange Act imposes liability on "every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act]" . . . "to the same extent as such controlled person" . . . "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). "Section 20(a) is the vehicle for imposing liability on control persons. The liability of a control person under section 20(a) is derivative of—and dependent upon—liability of a controlled person under section 10(b)." Singer v. Reali, 883 F.3d 425, 438 (4th Cir. 2018) (citing Yates, 744 F.3d at 894 n.8); see also In re Genworth Fin. Inc. Sec. Litig., 103 F. Supp. 3d 759, 790–91 (E.D. Va. 2015) ("On a motion to dismiss, a Section 20(a) claim will thus stand or fall based on the court's decision regarding the Section 10(b) claim." (citation omitted).

Accordingly, where the court dismisses without prejudice lead plaintiffs' Section 10(b) claims, it also dismisses without prejudice lead plaintiffs' Section 20(a) claims against defendants Bell, Rush, and Macdonald.

          c.      Section 14(a) Claims – Count Three

Lead plaintiffs assert claims under Section 14(a) of the Exchange Act and Rule 14a-9 against all defendants.

Section 14(a) makes it unlawful to solicit a proxy "in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78n(a)(1). SEC Rule 14a-9, promulgated pursuant to Section 14(a), prohibits the solicitation of proxies through a proxy statement that contains false or misleading material facts or omits any material fact that leaves a proxy statement false or misleading. 17 C.F.R. § 240.14a-9(a). "Whether a statement or omission is materially misleading 'depends on the perspective of a reasonable investor.'" Paradise Wire & Cable Defined Benefit Pension Plan v. Weil, 918 F.3d 312, 318 (4th Cir. 2019) (quoting Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 185 (2015)). "A fact is material if there is 'a substantial likelihood that the disclosure of the . . . fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" In re Willis Towers Watson PLC Proxy Litig., 937 F.3d 297, 304 (4th Cir. 2019) (quoting Greenhouse v. MCG Capital Corp., 392 F.3d 650, 656 (4th Cir. 2004)).

"Projections of future performance are generally not actionable under the federal securities laws as long as they are not worded as guarantees." Paradise Wire, 918 F.3d at 321 (citing Raab v. Gen. Physics Corp., 4 F.3d 286, 290 (4th Cir. 1993)). However, opinion statements may be actionable if they omit material facts that "conflict with what a reasonable investor would take from the statement itself." Omnicare, 575 U.S. at 189. This inquiry "always depends on context" because "[a]n investor reads each statement 'in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information.'" Paradise Wire, 918 F.3d at 322 (quoting Omnicare, 575 U.S. at 190). "[A]n omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." Id. Ultimately, "[a] reasonable investor is expected to understand a statement of opinion

in its full context and there will only be liability for 'the omission of material facts that cannot be squared with such a fair reading.'" Id.

The magistrate judge determined that lead plaintiffs sufficiently alleged material misrepresentations and omissions in proxy materials. Defendants object to the magistrate judge's determination, arguing that the alleged misrepresentations and omissions are not actionable because they are forward-looking statements accompanied by cautionary language. Defendants' argument invokes what is known as the "bespeaks caution" doctrine. "Under that doctrine, claims are subject to dismissal if cautionary language in the offering document negates the materiality of the alleged misrepresentations or omissions." Paradise Wire, 918 F.3d at 319 (quotations and citations omitted). "While general warnings may not negate the materiality of misrepresentations or omissions, specific warnings that are tailored to address the alleged misrepresentation or omission may negate their materiality when the total mix of information would not be significantly altered by the disclosures sought by the plaintiffs." Id.

Here, lead plaintiffs allege that defendants made statements in proxy materials projecting that the merger would result in high single-digit accretion in 2018 and double-digit accretion in 2019; forecasting inVentiv's net service revenue growth, adjusted EBITDA[9] growth, and predicting a return to historical growth in 2018; indicating that the commercial business was well positioned for growth due to the increase in drug approvals; stating that drug approvals were a "huge leading indicator" for modeling what the commercial business looks like going forward; and indicating that they were confident in the prospect of double digit growth. (Am. Compl. ¶¶ 96-99, 106-108, 229-234). According to lead plaintiffs, these statements constitute material misrepresentations and omissions because the "commercial business critically depended on the

---

[9] EBITDA refers to "earnings before interest, taxes, depreciation, and amortization." Sharma v. USA Int'l, LLC, 851 F.3d 308, 311 (4th Cir. 2017).

25

number of 100-plus sales team contracts it was able to win, irrespective of the total number of new drug approvals for the year"; as of May, June, and July of 2017, no more than two such contracts were available for bidding, neither of which inVentiv's commercial business had won; the number of new drug approvals was not a huge leading indicator for modeling the commercial business going forward;  the commercial business was not track to beat industry wide growth; and revenues would decrease into 2018.  (Id. ¶ 241).

The statements at issue are projections and opinions, which must be considered in their full context, including "hedges, disclaimers, and apparently conflicting information'", Paradise Wire, 918 F.3d at 322 (quoting Omnicare, 575 U.S. at 190), to determine if a reasonable investor would find them materially misleading. Considering the total mix of information available to the reasonable investor, including the extensive and specific cautionary language provided by defendants, the alleged misrepresentations and omissions were not materially misleading.

In particular, regarding the accretive potential of the merger, defendants warned in their Definitive Proxy Statement:

> **The merger may not be accretive and may cause dilution to the combined company's earnings per share, which may negatively affect the market price of common stock of the combined company.**
>
> INC Research and inVentiv currently anticipate that the merger will be accretive to INC Research's adjusted earnings per share beginning in first full year subsequent to the completion of the merger. However, this expectation is based on preliminary estimates, which may change materially. The combined company could also fail to realize any or all of the benefits anticipated in the merger or experience material delays or inefficiencies in realizing such benefits, which could cause dilution to the combined company's adjusted diluted earnings per share or decrease or delay the expected accretive effect of the merger and cause a decrease in the market value of the combined company's common stock. This could negatively impact INC Research's earnings per share or decrease or delay the expected accretive effect of the merger and cause a decrease in the market price of common stock of the combined company.

(Definitive Proxy Statement (DE 55-13) at 45).  Relatedly, in defendant Syneos's May 10, 2017, Press Release, defendants cautioned that:

> [F]orward-looking statements are not guarantees of future results and are subject to risks uncertainties and assumptions that could cause actual results to differ materially from those expressed in any forward-looking statements . . . Important risk facts that may cause such a difference include, but are not limited to risks and uncertainties related to . . . (iii) the ability of [defendant Syneos] and inVentiv to integrate their businesses successfully and to achieve anticipated synergies, (iv) the possibility that other anticipated benefits of the proposed transaction will not be realized, including without limitation, anticipated revenues, expenses, earnings and

<u>other financial results and growth and expansion</u> of the new combined company's operations . . .

(May 10, 2017, Press Release (DE 55-6) at 27) (emphasis added); (<u>see also</u> Transcript of May 10, 2017, Conference Call (DE 55-5) at 3) ("Actual results may differ materially from those indicated by these forward-looking statements as a result of various important factors. . . any forward-looking statements represent our views as of today and should not be relied upon as representing our views as any subsequent date. While we might update forward-looking statements at some point in the future, unless legally required, we specifically disclaim any obligation to do so.").

Regarding growth of the commercial business, defendants specifically warned:

*The combined company may not successfully run a successful contract commercial organization.*

The combined company anticipates significant value will be realized by the acquisition of inVentiv's commercial business segment. However, because INC Research has not historically had a commercial business segment in the past, it is possible that the combined company will fail to achieve the anticipate benefits of the combination. The combined company may not be as successful in cross-selling its clinical and commercial services as projected prior to the consummation of the merger.

In addition, the commercial business segment will introduce risks to the combined company that INC Research has not been subject to historically. Those risks include:

- commercial segment contracts tend to have shorter durations and it can be difficult to predict whether these contracts will be renewed;

- biopharmaceutical companies can encounter difficulties raising capital to fund their R&D and commercialization projects;

- governmental reform or private market initiatives intended to reduce the cost of biopharmaceutical products, or governmental, medical association or biopharmaceutical industry initiatives designed to regulate the manner in which biopharmaceutical companies promote their products, each of which can limit the value of inVentiv commercialization services;

- further consolidation in the biopharmaceutical industry, which could negatively affect certain of the combined company's commercial service offerings by reducing overall outsourced expenditures if the combined company is unsuccessful in winning business from the consolidated entity, or could result in the delay or cancellation of existing projects, cause reductions in overall outsourcing expenditures, or lead to increased pricing pressures; and

- companies electing to perform clinical development and commercialization services the combined company will provide internally based on industry or company specific factors, such as the rate of new product development, the number of professionals employed internally in relation to demand or the need to promote new and existing products or develop new products.

(<u>Id.</u> at 49).

Finally, regarding inVentiv's forecasted revenue growth, defendants cautioned

*Financial forecasts regarding INC Research and inVentiv may not be realized.*

In connection with the merger, internal, stand-alone, pre-transaction financial forecasts were prepared for INC Research and inVentiv. These financial forecasts were based on numerous variables and assumptions that were deemed to be reasonable by the management of each respective party. These variables and assumptions are inherently uncertain and may be beyond either party's control. Important factors that may affect actual results and cause these financial forecasts not to be achieved include, but are not limited to, risks and uncertainties relating to each party's business, the regulatory environment generally, general business and economic conditions and other factors. These forecasts were not prepared with a view to public disclosure. The failure of INC Research's or inVentiv's businesses to achieve projected results could have a material adverse effect on the price of combined company's common stock, the combined company's financial position, and the combined company's operating results and cash flows.

(<u>Id.</u> at 44); (<u>see id.</u> at 103) ("A summary of the INC Research forecasts and the adjusted inVentiv forecasts is not included in this document to influence your decision whether to vote for or against

the proposal to adopt the merger agreement.  The inclusion of this information should not be regarded as indication that the Board, INC Research's advisors or other representatives or any other person considered, or now considers such financial forecasts to be material or to be necessarily predictive of actual future results, and these financial forecasts should not be relied upon as such.").

The foregoing warnings were extensive and tailored specifically to the statements challenged by lead plaintiffs.  Indeed, defendants reiterated numerous times that their growth projections were subject to various risks and uncertainties, that they would not be updating their projections to reflect the occurrence of future events, and they did not include the revenue forecasts for purposes of influencing the shareholders' vote on the merger.  In light of these cautionary statements, the court finds that a reasonable investor would not have viewed the total mix of information significantly altered if the alleged omission regarding 100-plus sales team contracts had been disclosed.  See Paradise Wire, 918 F.3d 312 (finding warnings such as "there can be no assurance that the AFIN Standalone Projections will be realized or that actual results will not be significantly higher or lower than forecasted" and "AFIN Standalone Projections reflect assumptions that are subject to change and do not reflect revised prospects for AFIN's business, changes in general business or economic conditions or any other transaction or event that has occurred or may occur" to sufficiently negate materiality of defendant's projections); cf. Singer, 883 F.3d at 442 (finding that defendant's general warning that it "may be subject to or otherwise affected by federal and state healthcare laws, including fraud and abuse and health information privacy and security laws, and could face substantial penalties if we are unable to fully comply with such laws" did not negate the materiality of its failure to divulge its illegal activities and fraudulent reimbursement scheme).

Importantly, "[t]he federal securities laws provide important protections against false and misleading statements and omissions. However, they do not provide guarantees of financial success. Likewise, they do not render carefully tailored warnings meaningless." Paradise Wire, 918 F.3d at 323. Accordingly, the court grants defendants' motion to dismiss in this part, and lead plaintiffs' Section 14(a) claims are dismissed without prejudice.

    d.    Section 20(a) Claims - Count Four

Lead plaintiffs assert claims for control person liability under Section 20(a) of the Exchange Act, predicated on alleged Section 14(a) violations, against defendants Bell, Macdonald, Rush, Breckon, Burgstahler, Harty, Kender, Klitgaard, Meyers, Monaghan, Norton, and Pâques. Because control person liability claims asserted under Section 20 of the Exchange Act require an underlying violation of another section of the Act, these claims must also be dismissed without any need to address whether or to what extent defendants Bell, Macdonald, Rush, Breckon, Burgstahler, Harty, Kender, Klitgaard, Meyers, Monaghan, Norton, and Paques are "control persons" under Section 20. See In re Willis Towers Watson PLC Proxy Litig., 937 F.3d at 309 ("A Section 20(a) claim requires an underlying violation of the Exchange Act. When the district court dismissed the Section 14(a) claim, the only substantive Exchange Act claim, it also dismissed the Section 20(a) claim for lack of a predicate.") (internal citation omitted)). Accordingly, defendants' motion to dismiss is granted in this part, and lead plaintiffs' Section 20(a) claims are dismissed without prejudice.

## CONCLUSION

Based on the foregoing, the court ADOPTS IN PART and REJECTS IN PART the M&R, as set forth herein. Lead plaintiffs' motion to strike is GRANTED IN PART and DENIED IN PART. (DE 62). Defendants' motion to dismiss (DE 54) is GRANTED, and lead plaintiffs'

amended complaint is DISMISSED WITHOUT PREJUDICE. Lead plaintiffs are allowed opportunity to file a motion to amend their amended complaint within 21 days of the date of this order. In the event lead plaintiffs do not do so, without further order of the court, the clerk shall enter judgment in favor of defendants on the basis of this order, and close this case.

SO ORDERED, this the 30th day of August, 2021.


LOUISE W. FLANAGAN
United States District Judge